Larry J. Wulkan (021404)
**ZWILLINGER WULKAN PLC**
2020 North Central Avenue, Suite 675
Phoenix, Arizona 85004
Tel: (602) 609-3800
Fax: (602) 962-0089
Email: larry.wulkan@zwfirm.com

*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Nubia Rodriguez, a single woman,<br><br>Plaintiff,<br><br>v.<br><br>City of Phoenix, a political subdivision of the State of Arizona; Michael Davidson and Elizabeth Davidson, husband and wife; Gregory Gibbs and Joy Parker, husband and wife;<br><br>Defendants. | No. 2:23-cv-02232-DJH-MTM<br><br>**STATEMENT OF FACTS IN SUPPORT OF PLAINTIFF NUBIA RODRIGUEZ'S MOTION FOR SUMMARY JUDGMENT** |

Plaintiff Nubia Rodriguez hereby submits her Statement of Facts in support of her motion for summary judgment.

1. On the morning of March 21, 2019, Officer Paul Rutherford and his partner, Officer Miller, were investigating a traffic accident near 75th Drive and Indian School Road. **Exhibit 1** – Officer Davidson's Incident Report at PPD-RODRIGUEZ000024-25.

2. Phoenix PD Operations Orders, on which all officers are trained, encouraged officers investigating crashes to "make maximum use of flares" or to set up barricades for a protective barrier around a crash and required officers in the roadway to wear reflective vests. **Exhibit 2** – Phoenix PD Operations Order 4.2; **Exhibit 3** – Excerpts of Deposition of Cummings Smith at 26:21-33:20; **Exhibit 4** – 9/21/22 Preliminary Hearing Transcript at 6:21-7:17.

3. Officer Rutherford, however, had not set up any road flares or other barriers alerting drivers to the traffic accident, nor was he wearing a reflective vest. **Exhibit 5** – Expert Report of Edward Tuttle at 4; Ex.4 at 6:21-7:21.

4. While investigating, the officers received a radio call about an incident at a restaurant across the street. Ex.1 at PPD-RODRIGUEZ000024-25.

5. Officer Miller and Officer Rutherford did not initially respond to that call; it was not until an individual later flagged down Officer Miller that he crossed the street to investigate. Ex.1 at PPD-RODRIGUEZ000024-25

6. Some time after Officer Miller left to investigate the other call, Officer Rutherford informed the individuals involved in the traffic accident that he was going to check on his partner, calmly placed his paperwork inside his patrol car, and locked the vehicle, which was blocking the southernmost eastbound lane of Indian School Road. **Exhibit 6** – Officer Paul Rutherford Body-Worn Camera Video at 08:13:36-08:14:05 GMT (ROD001690_Rutherford4).

7. Mid-block, without using a crosswalk, Officer Rutherford began to cross Indian School Road on foot. He looked left and raised his hand to stop a Toyota Tundra driving eastbound, but he did not use a whistle in conjunction with his hand signal, as trained. Ex.6 at 08:14:06 GMT; Ex.3 at 32:3-16; Ex.4 at 9:3-10.

8. Even though Officer Rutherford could not have seen beyond the Tundra to spot approaching vehicles in the subsequent two-way turn lane, he ran into the turn lane—without looking both ways, pausing, or otherwise alerting oncoming traffic in the turn lane to his presence. Ex.4 at 9:3-10, 85:6-13, 83:21-85:13, 194:14-24; Ex.6 at 08:14:06-08:14:10; **Exhibit 7** – Report of Phoenix PD Detective Dager at 1497-1500.

9. At the same time, Nubia was driving her Ford Expedition eastbound on Indian School Road on the way to work. **Exhibit 8** – Incident Report of Officer Raymond Reed at PPD-RODRIGUEZ0000084; **Exhibit 9** – Declaration of Nubia Rodriguez at ¶ 1.

10. She was not impaired, nor was she distracted. **Exhibit 10** – September 20, 2022, Preliminary Hearing Transcript at 78:21-79:22.

11. Because Nubia did not need to be at work until 9 or 10 am, and traffic had slowed, Nubia made a last-minute decision to find a fast-food restaurant for breakfast; she told this to investigating officers. Ex.8 at PPD-RODRIGUEZ000084; Ex.9 at ¶ 2.

12. Even after stopping for breakfast, Nubia would have arrived at work 12-14 minutes before 9 am. **Exhibit 11** – Expert Report of Heston Silbert at 14; Ex.9 at ¶ 3.

13. Nubia entered the two-way left turn lane, intending to turn into a shopping complex on the north side of Indian School Road. Ex.8 at PPD-RODRIGUEZ000084; Ex.9 at ¶ 4.

14. Before she could turn, however, Officer Rutherford ran out in front of her vehicle; one witness stated that Officer Rutherford "shot out." Ex.8 at PPD-RODRIGUEZ000085; **Exhibit 12** – Interview with Madeline Barger at 06:33-6:40; **Exhibit 13** – Excerpts of Deposition of Michael Davidson at 108:20-109:9; Ex.9 at ¶ 5.

15. Officer Rutherford and Nubia had been obstructed from each other's view by the Tundra. Nubia had no time to avoid hitting him, nor could she have foreseen Officer Rutherford running into the road. Ex.8 at PPD-RODRIGUEZ000085; *see also* Ex.4 at 9:20-11:15; Ex.9 at ¶ 5; **Exhibit 14** – 8/20/20 Grand Jury Transcript at 23:2-15.

16. Officer Rutherford later passed away. Ex.1 at PPD-RODRIGUEZ000021.

17. After the collision, Phoenix Police Department officers placed Nubia in a fire department and mobile command vehicles and spoke with her. Nubia was not allowed to have her phone, and officers watched her at all times. **Exhibit 15** – Officer Christopher Outram Body-Worn Camera Video at 08:39:47-08:41:32 GMT; Ex.9 at ¶ 6.

18. Despite Nubia repeatedly requesting to call an attorney, officers denied her that opportunity. Ex.15 at 9:45:41-9:45:54, 9:49:20-9:50:15 GMT.

19. Responding officers spoke to eyewitnesses who described Nubia's speed as "normal, not fast but not slow," or a "normal slow pace due to the accident." Ex.13 at 142:14-143:10, 143:17-144:18.

20. Others estimated that Nubia was driving somewhere between 15 and 45 miles per hour, consistent with the 45 mile per hour speed limit on that section of Indian School Road. Ex.13 at 147:9-149:19, 151:5-18, 153:10-154:21.

21. Although one witness stated that Nubia's speed "felt fast," she later clarified that Nubia could have been driving 15-25 miles per hour. Ex.13 at 153:10-154:14

22. Officers on-scene cherry-picked witness statements, even discussing whether certain drivers might "be a better witness" to corroborate officers' desired narrative that Nubia was driving at a high speed; when they did not find a "better witness," one officer stated that "it is what it is." Ex.15 at 09:30:31-09:31:04 GMT (ROD001684).

23. Defendant Davidson, a detective in training with the Vehicular Crimes Unit, was assigned as the case agent for Nubia's case, while Defendant Gibbs served as an accident reconstructionist. Ex.13 at 32:16-33:9; Ex.10 at 129:7-11.

24. Phoenix Police Department Detective Dager performed an initial crash analysis, which concluded that Nubia was traveling between 36 and 40 miles per hour. Ex.7 at 1500.

25. Gibbs, however, was asked to perform a second crash analysis in addition to Detective Dager's analysis. Ex.10 at 129:12-18.

26. The request to perform a second analysis was highly unusual: Gibbs had "never seen" the department perform a second analysis. Ex.10 at 129:15-23.

27. To perform the second analysis, Gibbs used Berla iVe ("Berla") software, which extracts GPS data from a vehicle and compares the vehicle's interaction with satellites to generate data and predictions about a vehicle's speed and location. **Exhibit 16** – Report of Gregory Gibbs at 21; *see id*., generally; Ex.10 at 142:16-143:18; **Exhibit 17** – Declaration of Robert D. Anderson at 1-2.

28. But Gibbs was not certified in using Berla data and had never used it before, and he knew that Berla was not widely accepted in the accident reconstruction community due to inaccuracy. **Exhibit 18** – Excerpts of Deposition of Gregory Gibbs at 39:19-40:24; Ex.4 at 22:7-25, 40:3-12; Ex.17 at 1-4.

29. On the day of the accident, Berla representatives warned Phoenix PD Officer Dennison that they were "unable to quantify the accuracy of...[extracted] GPS Positions." **Exhibit 19** – Officer Chad Dennison Supplemental Report at 2.

30. Gibbs did not learn about that warning until after completing his report, and he never stated that he was untrained in using Berla data. *See* Ex.16, generally; Ex.4 at 29:20-33:15, 40:21-43:24; Ex.18 at 21:23-22:15, 39:19-40:19.

31. Reflecting these issues, the Berla data taken from Nubia's vehicle showed impossible speed variations, which Gibbs could not explain. For instance, Gibbs "was unable to determine why different speeds were recorded at the same location a second apart." Ex.16 at 21, 48; Ex.13 at 165:9-166:8.

32. Instead, Gibbs misrepresented the findings of the scientific authority cited in his report and incorrectly asserted that Berla accurately determined Nubia's speed as approximately 50 miles per hour. Ex.16 at 21, 36; Ex.17 at 1-4.

33. Gibbs did not mention or take into account Nubia's height in her vehicle or the height of the Toyota Tundra in determining whether it obstructed Nubia's view, nor did he account for the fact that Officer Rutherford's position could be off by up to two or three feet, given the inability to position Officer Rutherford in the scene with a "high degree of precision[.]" Ex.18 at 36:20-39:13; Ex.4 at 75:15-19; *see also* Ex.16 at 14, 18; Ex.5 at 2.

34. Even though the Berla data indicated a wide range of speeds, Gibbs never addressed this, and he could not explain why he only used the Berla data to support a higher speed than Detective Dager's initial analysis. Ex.16; Ex.4 at 25:1-27:4, 63:19-64:18.

35. Gibbs failed to mention that, given the unreliable data, Nubia could have been traveling at a slower speed. This omission was problematic, as Gibbs' report was the only document Davidson later used to support both Nubia's approximate speed of 50 miles per hour and the distance Nubia purportedly traveled in the turn lane. Ex.16; Ex.5 at 4; Ex.13 at 159:7-160:9.

36. Gibbs, however, did conclude that "[i]t needs to be considered that Ofc. Rutherford could have also avoided the collision if he had stopped and looked west down the two-way left turn lane prior to entering it." Ex.16 at 37.

37. Relying in large part on the Berla data and Gibbs' report, Davidson submitted a Form 4 to the Maricopa County Attorney's Office to initiate criminal proceedings after an unusually long six-month investigation. **Exhibit 20** – Form 4.

38. Davidson personally hand-delivered the case file to the Maricopa County Attorney's Office; that was the "first and only time" he had ever done so. Ex.13 at 67:3-68:18.

39. Under normal circumstances, Nubia likely would not have even received a traffic citation, nor would any officer have charged Nubia with a felony. Ex.11 at 13; Ex.5 at 6.

40. But in a statement of probable cause submitted with the Form 4, Davidson asserted that there was probable cause to charge Nubia with manslaughter. Ex.20.

41. Davidson's statement, however, omitted crucial details, including that 1) Rutherford crossed mid-block, 2) Rutherford did not use flares, a reflective vest, a whistle, or other safety methods as trained under the Phoenix PD's Operations Orders, and c) Gibbs had concluded that Officer Rutherford could have avoided the accident. Ex.20; *see also* Ex.16 at 37; Ex.13 at 96:25-104:24.

42. Davidson never mentioned the Berla representative's warning, nor that no independent Berla-certified expert reviewed the Berla data or Gibbs' report. Ex.13 at 162:7-22, 165:24-167:22.

43. Although he included witness statements suggesting that Nubia was driving fast, Davidson omitted other, contradictory witness statements that Nubia was driving at a normal speed, under the posted speed limit. Davidson omitted similar evidence from his supplemental incident report recommending manslaughter charges. *See, generally*, Ex.20; Ex.13 at 142:14-144:18, 147:9-149:19, 151:5-18, 153:10-154:21; **Exhibit 21** – Michael Davidson's Supplemental Incident Report.

44. After submitting his Form 4, Davidson learned that the Maricopa County Attorney reassigned the case to another prosecutor, who would pursue misdemeanor charges. Ex.13 at 75:8-76:16, 182:18-184:7.

45. At that point, Davidson had no substantial discussions with members of the Maricopa County Attorney's Office about the case. Ex.13 at 49:4-50:25, 59:3-19, 104:25-105:12, 164:4-13, 193:2-13.

46. Davidson created a PowerPoint presentation for the Maricopa County Attorney and "argued with" her about the charges and reassignment. **Exhibit 22** – Paul Presentation; Ex.13 at 76:17-77:24, 170:1-171:9.

47. Davidson had never before created such a presentation in another case, nor has he done so since. Ex.13 at 182:8-183:7.

48. The presentation, which included photographs, diagrams, Berla data charts, and a narrative of the collision, was intended to provide a "more in-depth" understanding of the evidence, yet it omitted Rutherford's policy failures, Gibbs' statement regarding Rutherford's ability to avoid the collision, and the lack of verification for the Berla data. Ex.22; Ex.13 at 202:12-19.

49. The presentation also suggested that Officers Miller and Rutherford responded to an urgent "hot call" across the street. Ex.22 at Slide 2.

50. Davidson did not present or discuss issues with data reliability with the prosecutors, nor did he reveal the internal disagreements about the scene reconstruction. Ex.13 at 104:25-105:12, 164:4-16.

51. Following Davidson's presentation, the Maricopa County Attorney's Office ultimately sought an indictment for negligent homicide, and a prosecutor presented the case to the grand jury on August 20, 2020, with Davidson as the sole witness. *See* Ex.14.

52. Davidson never discussed his grand jury testimony with the prosecutor in advance or discussed what evidence to present. Ex.13 at 49:4-50:25, 59:3-19, 104:25-105:12, 164:4-13, 193:2-13.

53. Davidson had testified in numerous other cases before the grand jury and had always convinced the grand jury to return a true bill. Ex.13 at 60:5-17, 117:14-25.

54. Here, however, he misstated, exaggerated or omitted critical information, such as implying that Officer Rutherford urgently responded to a dangerous incident across the street. Ex.14 at 10:9-15, 11:5-8.

55. Davidson failed to tell the grand jury that Officer Rutherford did not use a crosswalk, flares, whistle, or reflective gear. Instead, he told the grand jury that Officer Rutherford stopped traffic before crossing the street, omitting contradictory witness testimony that Officer Rutherford "shot out into traffic." *See, generally,* Ex.14; Ex.13 at 107:6-109:9; Ex.12 at 06:33-06:40.

56. When questioned by the grand jury, Davidson inaccurately claimed that Officer Rutherford was "acting under the color of his authority" and "had the right of way as a roadway worker," even though pedestrians outside crosswalks must yield to vehicles, with no exception for officers. Ex.14 at 22:5-18; Ex.13 at 121:2-124:19.

57. Davidson also made numerous mischaracterizations about Nubia's driving, testifying that Nubia was "trying to get ahead of traffic by going around" and "created this line" to drive faster, suggesting that Nubia illegally used the turn lane because she "running late" to work. Ex.14 at 12:11-16, 18:8-13, 32:7-33:1.

58. Nubia was driving under the speed limit and lawfully using the lane to make a left turn. Ex.11 at 14-15; Ex.9 at ¶¶ 2-4.

59. When discussing Nubia's speed, Davidson characterized the Berla data as reliable and asserted that the data showed Nubia driving 50 miles per hour before braking. Ex.14 at 12:17-25, 14:2-15:16, 18:19-25, 26:25-27:19, 29:2-30:23, 32:2-15.

60. Davidson did not inform the grand jury that the Berla data was unverified and unreliable, was not reviewed by Berla-certified personnel, and resulted in contradictory readings that Gibbs could not explain. *See, generally,* Ex.14.

61. Davidson also omitted witness statements that Nubia was driving at a normal speed, under the posted speed limit, and instead asserted that Nubia was driving "too fast for the conditions." Ex.14 at 34:1-2.

62. Following Davidson's testimony, the grand jury indicted Nubia, and she was given supervised release conditions, including requirements to be fingerprinted, submit to DNA testing, appear at multiple court hearings, including a three-day preliminary hearing, and was prohibited from leaving the state without permission. **Exhibit 23** – 8/20/20 Indictment; **Exhibit 24** – 9/17/20 Final Release Order.

63. The superior court, upon Nubia's challenge to the indictment, expressed its "very serious concerns" about the testimony presented to the grand jury and found Davidson's omissions and misrepresentations to be troubling and preclusive of a fair presentation. **Exhibit 25** – 8/11/22 Ruling and Order Remanding to Grand Jury.

64. In September 2022, the superior court held a three-day preliminary hearing for probable cause, during which Davidson and Gibbs testified. Exhibits 4, 10; **Exhibit 26** – 9/22/22 Preliminary Hearing Transcript.

65. At the close of the preliminary hearing on September 22, 2022—three and a half years after the underlying events—the superior court concluded that the prosecution had not shown probable cause for the charges against Nubia and dismissed the case. Ex.26 at 38:9-47:7.

66. The superior court gave no weight to the Berla data based on "the lack of expertise of the officers with the Berla data;" an insufficiency of data points; and "the

1  clear uncertainty of GPS as evidence[d] by different GPS readings" in Nubia's vehicle. Ex.26 at 42:22-43:6.

67. The court found that the prosecutor had not supported a speed of 50 miles an hour, but even that speed would not even satisfy gross negligence. Ex.26 at 43:7-15.

68. As for the alleged failure to perceive a risk, the court concluded that "[e]ach situation, whether it's a car accident or not, presents a different circumstance and a different set of risks"; the potential risk for a driver in the turn lane was "Officer Rutherford, unfortunately, crossing traffic, running across traffic, stopping the vehicle in the through lane, but not looking or waiting for the middle lane." Ex.26 at 40:4-41:19, 45:15-18.

69. But the court found that it was "not reasonable" for Nubia to anticipate any risk of Officer Rutherford running across traffic in front of her, because "he appeared from a place that he shouldn't have been to a regular driver" and there was "no evidence that she had time to perceive" a risk and could have stopped. Ex.26 at 44:2-45:23.

70. Accordingly, the court found that "identifying the risk and whether there is a gross deviation, it is not a risk that she could have reasonably suspected and the failure to perceive it does not constitute a gross deviation from the standard of care that a reasonable person would observe in this situation." Ex.26 at 46:6-12.

71. Instead, Nubia had "a right to assume, when operating her vehicle, that others will follow the rules of the road, whether that's a pedestrian or another vehicle. And, unfortunately, Officer Rutherford did not." Ex.26 at 46:13-47:7.

72. On the day of the accident, Nubia was placed on paid leave from her job because Davidson met with her employer. Ex.9 at ¶ 7.

73. Weeks later, Nubia met with her supervisor and human resources, who informed her that she could return to work, but if she was ticketed or charged, she would be terminated. Ex.9 at ¶ 7.

74. Nubia returned to work, and human resources met with her regularly to ask if she had any new information on the investigation. By September, she resigned because of the stress of commuting to and from work and because she did not feel comfortable under such a microscope. Instead, she sought employment closer to her home. Ex.9 at ¶ 7.

75. Eventually, she had to take extra jobs to pay for the enormous financial burden of her legal defense. **Exhibit 27** – Excerpts of Deposition of Nubia Rodriguez at 42:6-53:17; Ex.9 at ¶¶ 7-8.

76. Due to the indictment, Nubia's fingerprint clearance card was suspended, and she was forced to seek employment outside her professional scope and expertise to supplement her income, such as cleaning and warehouse jobs that did not require background checks. Ex.9 at ¶ 9.

77. Because of the criminal prosecution, Nubia was even denied employment opportunities after her case was dismissed and her fingerprint clearance card was reinstated. Ex.9 at ¶ 10.

78. Although she has a bachelor's degree in public administration and intended to remain in public service until retirement, she has had difficulty finding new government employment. Ex.9 at ¶ 11.

79. Nubia's foster child—who she loved and intended to adopt—was removed from her home, and Nubia never saw her again. Ex.27 at 39:29-40:23, 69:10-24; Ex.9 at ¶ 12.

80. The trauma of the child's removal forced Nubia to surrender her long-standing foster license. Ex.27 at 40:4-23.

81. Nubia also lost her vehicle to impoundment and declared bankruptcy due to debt. Ex.27 at 67:6-16.

82. Over the course of the drawn-out proceedings, Nubia worried that she would go to prison. In addition to severe panic attacks that sent her to the emergency

1 | room, she suffered anxiety, depression, stomach pains, headaches, and difficulty sleeping.
2 | Ex.27 at 18:3-9, 27:13-32:9, 62:16-64:13; Ex.9 at ¶ 13.
3 |     83.    Eventually, Nubia's mental health deteriorated to the extent that she sought
4 | continuing professional mental healthcare. Ex.27 at 18:3-9, 25:2-27:2, 27:13-32:9.
5 |     RESPECTFULLY SUBMITTED this 27th day of January, 2026.

**ZWILLINGER WULKAN PLC**

By: */s/ Larry J. Wulkan*
Larry J. Wulkan
2020 North Central Avenue, Suite 675
Phoenix, Arizona 85004
*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 27, 2026, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Kathleen L. Wieneke
Christina Retts
WIENEKE LAW GROUP, PLC
1225 West Washington Street, Suite 313
Tempe, Arizona 85288
kwieneke@wienekelawgroup.com
cretts@wienekelawgroup.com

*Attorneys for Defendants City of Phoenix, Michael Davidson and Gregory Gibbs*

/s/ Stephanie Dolfini