MGD

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

Nubia Rodriguez,
Plaintiff,
v.
City of Phoenix, et al.,
Defendants.

No. CV-23-02232-PHX-DJH (MBM)

**ORDER**

Plaintiff Nubia Rodriguez brought this civil rights action through counsel in Arizona state court and Defendants removed the case to this Court. Before the Court are Plaintiff's Motion for Summary Judgment (Doc. 120); Defendants' Motion for Summary Judgment and Response to Plaintiff's Motion for Summary Judgment (Doc. 134); and Defendants' Rule 702 Motion to Exclude Plaintiff's Expert (Doc. 131).

## I. Background

In the First Amended Complaint (FAC), Plaintiff sues the City of Phoenix and City of Phoenix Police Department (PPD) Officers Michael Davidson and Gregory Gibbs and their spouses. (Doc. 29.) Plaintiff's claims relate to an auto accident on March 21, 2019, in which PPD Officer Paul Rutherford, who was investigating a different accident, was struck and killed by Plaintiff's oncoming car. Plaintiff was later indicted for negligent homicide, and the case was dismissed several years later based on lack of probable cause.

Plaintiff asserts a malicious prosecution claim under Arizona state law against Defendants Davidson, Gibbs, and City of Phoenix (Count One); a malicious prosecution

claim under 42 U.S.C. § 1983 against Defendants Davidson and Gibbs (Count Two); an intentional infliction of emotional distress (IIED) claim against Defendants Davidson, Gibbs, and City of Phoenix (Count Four); and a Fourteenth Amendment due process claim against Defendants Davidson and Gibbs (Count Six).[1]

## II. Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

---

[1] Counts Three (Fourth Amendment unlawful seizure) and Five (conspiracy) asserted against Defendants Davidson and Gibbs were dismissed without prejudice on January 21, 2026, pursuant to the Parties' stipulation. (Docs. 117-118.)

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

## III. Procedural Issues and Defendants' Motion to Exclude Plaintiff's Expert

Practitioners in Arizona Federal District Court must adhere to its Local Rules. Local Rule of Civil Procedure 56.1 requires that a controverting statement of facts by a party opposing a motion for summary judgment be separate from that party's memorandum of law and set forth for each paragraph of the moving party's separate statement of facts, a correspondingly numbered paragraph indicating whether the party disputes the statement of fact set forth in that paragraph and a reference to the specific admissible portion of the record supporting the party's position if the fact is disputed. Defendants did not comply with Rule 56.1 by filing a separate controverting statement of facts to Plaintiff's Statement of Facts. Rather, they inserted "Responses and Objections to Plaintiff's SOF by Paragraph" in their Motion for Summary Judgment and Response in Opposition to Plaintiff's Motion for Summary Judgment. (*See* Doc. 134 at 18-21.) Defendants' approach is contrary to the Court's procedure. While Defendants do admit or deny in whole or in part each of Plaintiff's 82 facts in her Statements of Fact, they do not cite any evidence to support their disputes. Occasionally, Defendants cite their own Statement of Facts, but this method requires Court to review Defendants' Statement of Facts and then find the evidence cited for those facts to discern the basis of Defendants' dispute. That is not the Court's role. Nor does it comply with the Local Rules of Civil Procedure. Accordingly, the Court will not further consider Defendants "Responses and Objections to Plaintiff's SOF by Paragraph."

Also, while Plaintiff did file a separate Controverting Statement of Facts, she, too, primarily cites to her own Statement of Facts to support her disputes without specifying the evidence to support a dispute. Therefore, the Court will only address disputes that

Plaintiff has properly supported.

As to Defendants' Motion to Exclude Plaintiff's Expert, the Court will deny this Motion because the Court did not rely on either of the Parties' experts in deciding the Motions for Summary Judgment.

## IV. Relevant Facts

### A. The Accident

On the morning of March 21, 2019, around 8:15 a.m., PPD Officer Rutherford and his partner, Officer Miller, were investigating a traffic accident near 75th Drive and Indian School Road in Phoenix. (Doc. 121, Pl.'s Statement of Facts (PSOF) ¶ 1; Doc. 129 at 1 Defs.' Statement of Facts (DSOF) ¶ 1.) Officer Rutherford parked the fully marked police Tahoe, with its red and blue lights activated, behind the disabled vehicle involved in the collision, which shut down the eastbound curb lane on Indian School Road. (DSOF ¶¶ 2-3.) PPD Operations Orders encouraged officers investigating crashes to "make maximum use of flares" or to set up barricades for a protective barrier around a crash and required officers in the roadway to wear reflective vests, but Officer Rutherford had not set up any flares or barriers alerting drivers to the traffic accident, and Rutherford was not wearing a reflective vest. (PSOF ¶¶ 2-3.) According to Defendants, there was not a specific need to place any additional flares or cones in the roadway. (DSOF ¶ 4.)

While on the scene of the initial accident, the officers heard a radio dispatch reporting that an individual was brandishing a firearm at the Federico's restaurant located at 7616 West Indian School Road. (DSOF ¶ 5.) Officer Miller crossed the street toward the restaurant to investigate the report and requested that dispatch notify Officer Rutherford. (*Id.* ¶ 7.) Dispatch advised Officer Rutherford that Officer Miller had responded to the call, and Officer Rutherford informed the individuals involved in the collision that he was going to check on his partner. (*Id.* ¶ 8.) After placing documents in his patrol vehicle and securing it, Officer Rutherford stopped eastbound traffic by raising his left arm up with his palm facing eastbound traffic, motioning for traffic to stop, and began crossing the roadway by entering the yellow two-way left turn lane. (*Id.* ¶¶ 9-10.)

Officer Rutherford crossed Indian School Road on foot mid-block, without using a crosswalk, looked left and raised his hand to stop a Toyota Tundra pickup truck driving eastbound, but he did not use a whistle in conjunction with his hand signal, as trained. (PSOF ¶ 7.) Even though Officer Rutherford could not have seen beyond the Tundra to spot the approaching vehicles in the adjacent two-way turn lane, he ran into the turn lane—without looking both ways, pausing, or otherwise alerting oncoming traffic in the turn lane to his presence. (*Id.* ¶ 8.) At that time, Plaintiff was driving her Ford Expedition eastbound on Indian School Road on the way to work. (*Id.* ¶ 9.) Plaintiff was not impaired or distracted. (*Id.* ¶ 10.) Plaintiff did not need to be at work until 9 or 10 am, and traffic had slowed, so she made a last-minute decision to find a fast-food restaurant for breakfast and entered the two-way left turn lane, intending to turn into a shopping complex on the north side of Indian School Road. (*Id.* ¶¶ 11, 13.) Before she could turn, however, Officer Rutherford ran out in front of her vehicle; one witness stated that Officer Rutherford "shot out." (*Id.* ¶ 14.) Officer Rutherford and Plaintiff had been obstructed from each other's view by the Toyota Tundra pickup, and Plaintiff had no time to avoid hitting him, nor could she have foreseen Officer Rutherford running into the road. (*Id.* ¶ 15.) Officer Rutherford sustained critical injuries and was transported to the hospital, where he later died. (DSOF ¶ 13.)

After the collision, PPD Officers placed Plaintiff in a fire department and mobile command vehicles and spoke with her, watching her at all times, without allowing her to have her phone, and denying her repeated requests to call an attorney. (PSOF ¶¶ 17-18.) Plaintiff told Detective Reed that after dropping her daughter off at school, she stopped for coffee at Dutch Brothers at Litchfield Road and Indian School Road before driving toward her work located at Central Avenue and Indian School Road.[2] (DSOF ¶ 23.) Plaintiff

---

[2] Defendants' facts often refer to Plaintiff as "Castillo," and Plaintiff is identified in the initial police reports as Nubia Castillo. (*See, e.g.*, DSOF ¶¶ 12, 16, 22, 23; Doc. 121-1 at 4, 21, 26.) In later court documents, Plaintiff is identified as Nubia Rodriguez. (*See, e.g.*, Doc. 121-2 at 40, 213, 218, 400.) To avoid confusion, where Defendants' facts say "Castillo" the Court will simply use "Plaintiff."

explained that she had started the job three days earlier, her hours were flexible, and she was not due to begin training until 10:00 a.m., so she was not in a hurry. (*Id.* ¶ 25.) A subsequent interview with Plaintiff's supervisor Rena Sims revealed that she was scheduled to be at an in-office training session on March 21, 2019, at 9 a.m. that day. (*Id.* ¶ 26.) Plaintiff told Detective Reed she was traveling approximately 25 mph when she entered the center turn lane and about 35 mph at the moment of impact. (*Id.* ¶ 32.) Plaintiff said Officer Rutherford "jumped out" in front of her, and although she immediately braked, she was unable to avoid the collision. (*Id.* ¶ 33.) She stated she saw the vehicles from the earlier collision only a split second before colliding with Officer Rutherford. (*Id.* ¶ 34.) Plaintiff was not arrested that day. (*Id.* ¶ 35.)

Responding officers spoke to eyewitnesses who described Plaintiff's speed as "normal, not fast but not slow," or a "normal slow pace due to the accident," and others estimated she was driving somewhere between 15 and 45 miles per hour, consistent with the 45 mile per hour speed limit on that section of Indian School Road. (PSOF ¶¶ 19-20.) Although one witness stated that Plaintiff's speed "felt fast," the witness later clarified that she could have been driving 15-25 miles per hour. (*Id.* ¶ 21.)

Witness Madeline Barger told officers that traffic was crawling in the area of the initial collision when she saw an officer signal that he was crossing the street and then heard the sound of screeching tires, saw a vehicle "clipping along at a pretty good speed" in the left turn lane, and saw the officer fly "high" in the air. (DSOF ¶¶ 15-16.) Another witness, Lisa Jacobsen, said she saw Plaintiff's Ford going "not fast but not slow" but approximately the speed limit and it looked like "she just wanted to get through the light." (*Id.* ¶ 17.) Ruben Garcia told law enforcement he saw a white truck[3] traveling eastbound in the two-way turn lane and he could not determine how fast the vehicle was going but assumed it was fast based on how Officer's Rutherford's body responded to the collision. (*Id.* ¶ 18.) Cynthia Peneyra told law enforcement that she saw a white vehicle going "pretty

---

[3] It is not clear from DSOF if "truck" refers to the Toyota Tundra pickup or to Plaintiff's Ford Expedition.

fast," estimating that it was going 40 mph but then said it could be 15 to 25 mph, and saw Officer Rutherford step out with his arm held up and outward, signaling traffic to stop. (*Id.* ¶ 19.) Peneyra thought "she's going too fast, she's going to hit him" and told law enforcement that her vehicle rocked from side to side when the truck went by her.[4] (*Id.* ¶ 20.)

**B. Two Investigations of the Accident**

Defendant Davidson, a detective in training with the Vehicular Crimes Unit, was assigned as the case agent for Plaintiff's case, while Defendant Gibbs served as an accident reconstructionist. (PSOF ¶ 23.) PPD Detective Dager performed an initial crash analysis, which concluded that Plaintiff was traveling between 36 and 40 mph. (*Id.* ¶ 24.) Defendant Gibbs, however, was asked to perform a second crash analysis in addition to Detective Dager's analysis, which was highly unusual because Gibbs had "never seen" the department perform a second analysis. (*Id.* ¶¶ 25-26.) To perform the second analysis, Defendant Gibbs used Berla iVe ("Berla") software, which extracts GPS data from a vehicle and compares the vehicle's interaction with satellites to generate data and predictions about a vehicle's speed and location. (*Id.* ¶ 27.)

Defendant Gibbs was not certified in using Berla data and had never used it before, and he knew that Berla was not widely accepted in the accident reconstruction community due to inaccuracy. (PSOF ¶ 28.) On the day of the accident, Berla representatives warned PPD Officer Dennison that they were "unable to quantify the accuracy of. . . [extracted] GPS Positions" from Plaintiff's vehicle, but Defendant Gibbs did not learn about that warning until after completing his report, and he never stated that he was untrained in using Berla data. (*Id.* ¶¶ 29-30.) Reflecting these issues, the Berla data taken from Plaintiff's vehicle showed impossible speed variations, which Defendant Gibbs could not explain; for instance, Gibbs "was unable to determine why different speeds were recorded at the same location a second apart." (*Id.* ¶ 31.) According to Plaintiff, Defendant Gibbs misrepresented the findings of the scientific authority cited in his report and incorrectly

---

[4] Again, it is unclear which vehicle "truck" refers to.

asserted that Berla accurately determined Plaintiff's speed as approximately 50 miles per hour. (*Id.* ¶ 32.) Defendant Gibbs did not mention or take into account Plaintiff's height in her vehicle (a Ford Expedition) or the height of the eastbound Toyota Tundra pickup truck, that Officer Rutherford raised his hand to stop, in determining whether the Toyota Tundra obstructed Plaintiff's view. (*Id.* ¶ 33.) Nor did Gibbs account for the fact that Officer Rutherford's reported position could be off by up to two or three feet, given the inability to position Officer Rutherford in the scene with a "high degree of precision[.]" (*Id.*) Although the Berla data from Plaintiff's vehicle indicated a wide range of speeds, Defendant Gibbs never addressed this, and he could not explain why he only used the Berla data to support a higher speed than Detective Dager's initial analysis. (*Id.* ¶ 34.) Defendant Gibbs failed to mention that, given the unreliable data, Plaintiff could have been traveling at a slower speed. (*Id.* ¶ 35.) This omission was problematic because Defendant Gibbs' report was the only document Defendant Davidson later used to support both Plaintiff's approximate speed of 50 mph and the distance Plaintiff purportedly traveled in the turn lane. (*Id.* ¶3 5.) Defendant Gibbs, however, did conclude that "[i]t needs to be considered that Ofc. Rutherford could have also avoided the collision if he had stopped and looked west down the two-way left turn lane prior to entering it." (*Id.* ¶ 36.)

Detective Dennison collected the Berla data from Plaintiff's vehicle. (DSOF ¶ 36.) His report states that there was an absence of data totaling about 30 seconds between Track 156 and Track 157. (*Id.* ¶ 37.) Track 157 began at 15:12:36 hours in the area of 8301 W. Indian School Road and continued to where Plaintiff's vehicle entered the center turn lane of West Indian School Road at 15:13:52. (*Id.* ¶ 39.) Plaintiff's vehicle "maintained speed," continued east on West Indian School Road and crossed the intersection of North 77th Avenue until the vehicle stopped on West Indian School Road in the area of N. 75th Dr. (*Id.* ¶ 40.) According to Defendants, the last speed register on the vehicle in the area of the crash was 49.8 mph on March 21, 2019, at 15:14:09. (*Id.* ¶ 41.) Detective Dennison contacted Berla support about the absence of data related to the vehicle's travel between Tracks 156 and Tracks 157 and was told that the data was most likely purged due to a

"wear leveling issue that is common with solid state storage devices." (*Id.* ¶ 42; Doc. 129-2 at 57.) A Berla representative told Detective Dennison that the location data and speeds reflected in the Berla extraction were a result of GPS, and the representative "was unable to quantify the accuracy." (DSOF ¶ 43; Doc. 129-2 at 57.)

Defendant Gibbs completed his crash analysis on August 2, 2019, and determined that the impact speed was 38 mph. (DSOF ¶¶ 45-46.) Defendant Gibbs wrote in his report that he was unable to determine why different speeds were recorded on the Berla data at the same location a second apart. (*Id.* ¶ 47.) Defendant Gibbs concluded that the collision would most likely not have been fatal if the vehicle was traveling below 35 mph, that the collision would have been completely avoided if the vehicle was traveling below 27 mph, and that based upon the avoidance speeds, "it is my opinion the Ford driver's decision to pass stopped and/or slowed traffic at a speed making avoidance of an unexpected hazard impossible was reckless." (*Id.* ¶ 48.)

**C. The Prosecution of Plaintiff**

Relying in large part on the Berla data and Defendant Gibbs' report, Defendant Davidson submitted a Form IV to the Maricopa County Attorney's Office (MCAO) to initiate criminal proceedings after a six-month investigation.[5] (PSOF ¶ 37.) Defendant Davidson personally hand-delivered the case file to the MCAO; that was the "first and only time" he had ever done so. (*Id.* ¶ 38.) In a probable cause submitted with the Form IV, Defendant Davidson asserted there was probable cause to charge Plaintiff with manslaughter. (*Id.* ¶ 40.) But Defendant Davidson's Form IV omitted crucial details, including that 1) Officer Rutherford crossed mid-block, 2) Officer Rutherford did not use flares, a reflective vest, a whistle, or other safety methods as trained under the PPD's Operations Orders, and 3) Defendant Gibbs had concluded that Officer Rutherford could

---

[5] "A Form IV outlines details of an arrest, including 'facts which establish probable cause for the crime(s) for which the defendant is booked or is charged.'" *Waichulaitis v. Sloat*, No. CV-25-00900-PHX-SMB, 2025 WL 3214312, at *1 (D. Ariz. Nov. 18, 2025) (quoting Ariz. R. Crim P. Form 4(a)). "A 'Form IV' is a form completed by police and used by Arizona courts. *Id.* (quoting Ariz. R. Crim. P. 41).

have avoided the accident. (*Id.* ¶ 41.) Defendant Davidson never mentioned the Berla representative's warning, nor that no independent Berla-certified expert reviewed the Berla data or Defendant Gibbs' report. (*Id.* ¶ 42.)

Defendant Davidson did not "rehash" all details of the investigation in the Form IV because it was a summary, and the entirety of the reports were submitted along with the Form IV. (DSOF ¶ 51.) Defendant Davidson asserted at deposition that "[i]f I left something out, then I would expect somebody else's report would pick that up and then they would pick up on that." (Doc. 129-2 at 50 (Davidson Dep. 104:16-18, Oct. 9, 2025.) Defendant Davidson did not include in his Form IV summary Defendant Gibbs' suggestion that Officer Rutherford could have avoided the collision by looking west because Defendant Davidson disagreed with that conclusion; Defendant Davidson asserted that "my opinion is that Officer Rutherford did look before attempting to cross, and he looked and he was satisfied with what he saw because he made the conscious decision to cross because he was satisfied with what he saw." (DSOF ¶ 52; Doc. 129-2 at 37, Davidson Dep. 100:1-5).)

In submitting the Form IV, Defendant Davidson expected—given his experience with prosecutors in the Vehicular Crimes Bureau—that they would review the entirety of the police reports and all evidence available to them, which is part of the reason that he hand-delivered all of the reports and a hard-drive of all electronic materials. (DSOF ¶ 57.) In reaching the charging recommendation, Defendant Davidson concluded that Plaintiff's speed at the time of the collision was—pursuant to Arizona Revised Statues § 28-701(a)—greater than reasonable and prudent in the conditions presented to Plaintiff given slowing traffic, an "elevated" police car with flashing lights, and use of the two-way turn lane in the manner she did. (*Id.* ¶ 54.)

Although he included witness statements suggesting that Plaintiff was driving fast, Defendant Davidson omitted other, contradictory witness statements that she was driving at a normal speed, under the posted speed limit. (PSOF ¶ 43.) Defendant Davidson omitted similar evidence from his supplemental incident report recommending manslaughter

charges. (*Id.*) After submitting his Form IV, Defendant Davidson learned that the Maricopa County Attorney reassigned the case to another prosecutor, who would pursue misdemeanor charges. (*Id.* ¶ 44.)

Defendant Davidson created a PowerPoint presentation for the Maricopa County Attorney and argued with her about the charges and reassignment. (PSOF ¶ 46.) Defendant Davidson had never created such a presentation in another case, nor has he done so since. (*Id.* ¶ 47.) The presentation, which included photographs, diagrams, Berla data charts, and a narrative of the collision, was intended to provide a "more in-depth" understanding of the evidence, yet it omitted Officer Rutherford's policy failures, Defendant Gibbs' statement regarding Rutherford's ability to avoid the collision, and the lack of verification for the Berla data. (*Id.* ¶ 48.) The presentation also suggested that Officers Miller and Rutherford were responding to an urgent "hot call" across the street. (*Id.* ¶ 49.) Defendant Davidson did not present or discuss issues with data reliability with the prosecutors, nor did he reveal the internal disagreements about the scene reconstruction. (*Id.* ¶ 50.)

Defendants assert that Defendant Davidson's presentation highlighted evidence that was in addition to what was included in the Form IV and the narrative. (DSOF ¶ 61.) This included a screen shot from Officer Rutherford's body camera video which "shows him [reflected] in the paint job of a passing vehicle looking to the west and—and stopping traffic. It was just to kind of counter—right—that he just kind of ran out there, that he actually did look, that he did do his due diligence to make sure it was safe for him to cross." (*Id.* ¶ 62.) During the presentation, Detective Davidson identified potential case issues, such as that Rutherford had not been wearing a vest and that the City's Operations Orders required him to do so. (*Id.* ¶ 63.)

Following Defendant Davidson's presentation, the MCAO sought an indictment for negligent homicide, and a prosecutor presented the case to the grand jury on August 20, 2020, with Defendant Davidson as the sole witness. (PSOF ¶ 51.) Defendant Davidson never discussed his grand jury testimony with the prosecutor in advance or discussed what evidence to present. (*Id.* ¶ 52.) According to Plaintiff, Defendant Davidson misstated,

exaggerated or omitted critical information in her case, such as implying that Officer Rutherford urgently responded to a dangerous incident across the street. (*Id.* ¶ 54.) Defendant Davidson failed to tell the grand jury that Officer Rutherford did not use a crosswalk, flares, whistle, or reflective gear. (*Id.* ¶ 55.) Instead, Davidson told the grand jury that Officer Rutherford stopped traffic before crossing the street, omitting contradictory witness testimony that Officer Rutherford "shot out into traffic." (*Id.* ¶ 55.)

When questioned by the grand jury, Defendant Davidson inaccurately claimed that Officer Rutherford was "acting under the color of his authority" and "had the right of way as a roadway worker," even though pedestrians outside crosswalks must yield to vehicles, with no exception for officers. (*Id.* ¶ 56.) Defendant Davidson also made numerous mischaracterizations about Plaintiff's driving, testifying that Plaintiff was "trying to get ahead of traffic by going around" and "created this line" to drive faster, suggesting that Plaintiff illegally used the turn lane because she was "running late" to work. (*Id.* ¶ 57.) Plaintiff was driving under the speed limit and lawfully using the lane to make a left turn. (*Id.* ¶ 58.) When discussing Plaintiff's speed, Defendant Davidson characterized the Berla data as reliable and asserted that the data showed Plaintiff driving 50 mph before braking. (*Id.* ¶ 59.) Defendant Davidson did not inform the grand jury that the Berla data was unverified and unreliable, was not reviewed by Berla-certified personnel, and resulted in contradictory readings that Defendant Gibbs could not explain. (*Id.* ¶ 60.) Defendant Davidson also omitted witness statements that Plaintiff was driving at a normal speed, under the posted speed limit, and instead asserted that Plaintiff was driving "too fast for the conditions." (*Id.* ¶ 61.)

Defendant Davidson told the grand jury that based on Berla data, Plaintiff entered the lane at about 7700 to 7800 feet (around 1100 feet from the point of impact), she then traveled eastbound in that two-way left-turn lane and she accelerated up to about 50 mph before applying the brakes just before impact. (DSOF ¶ 65.) Defendant Davidson confirmed that Berla showed that Plaintiff was traveling 37 miles per hour at the time of the crash. (*Id.* ¶ 66.) The grand jury was then informed there were two reconstructions

and Defendant Gibbs' reconstruction showed Plaintiff traveling 38 mph at the time of impact and Detective Dager's reconstruction showed Plaintiff traveling 36 to 40 mph. (*Id.* ¶ 67.) A grand juror asked Defendant Davidson if the car had the right of way. (*Id.* ¶ 68.) Defendant Davidson responded no because Officer Rutherford was acting under the color of his authority as he was in the roadway conducting an investigation and responding to a call. (*Id.* ¶ 69.) A grand juror asked if Officer Rutherford was excited about the "quote-unquote armed robbery" across the street and Detective Davidson replied he did not know. (*Id.* ¶ 70.) A grand juror then asked, "was there some excitement in the chatter" and Defendant Davidson responded, "He did not put out any radio. He basically said he was going to check on his partner." (*Id.* ¶ 71.)

The prosecutor had a duty to present evidence, not Defendant Davidson. (DSOF ¶ 72.) Defendant Davidson was required to respond to questions truthfully and answer the questions being asked in court. (*Id.* ¶ 73.) The decision to not ask Defendant Davidson about Officer Rutherford not crossing in the crosswalk or showing Officer Rutherford's BWC (body worn camera) video that showed where he crossed, was a decision by the prosecutor, not Defendant Davidson. (*Id.* ¶ 74.)

The grand jury indicted Plaintiff for Negligent Homicide, a class 4 dangerous felony. (DSOF ¶ 75.) Plaintiff was given supervised release conditions, including requirements to be fingerprinted, submit to DNA testing, appear at multiple court hearings, including a three-day preliminary hearing, and was prohibited from leaving the state without permission. (PSOF ¶ 62.)

**1. Plaintiff's Motion to Remand and Motion to Dismiss**

On March 3, 2021, Plaintiff moved to remand for a new determination of probable cause. (DSOF ¶ 78.) Plaintiff raised three areas of alleged deficiencies in the testimony: (1) false "legal conclusions" were presented as fact; (2) false statements were presented as fact (whether or not Officer Rutherford stopped traffic); and (3) false "expert opinion" (speeds at the time of the incident and survivable speeds). (DSOF ¶ 79.) In the Motion to Remand, Plaintiff repeatedly cited to the grand jury testimony to establish many of the facts

relating to the underlying accident. (*Id.* ¶ 80.) Plaintiff's motion for remand also relied on evidence from within the police reports: (1) Defendant Gibbs' conclusion in the report that "it needs to be considered that Ofc. Rutherford could have also avoided the collision if he had stopped and looked west down the two-way left turn lane prior to entering it"; and (2) Plaintiff told officers that she could not see Rutherford, and a witness opined that Plaintiff was traveling at a "normal slow pace" and not a "high rate of speed." (*Id.* ¶ 81.) Plaintiff argued that at the time of the grand jury the government possessed this information and withheld their own expert's conclusions. (*Id.* ¶ 82.)

On April 22, 2022, Plaintiff filed a Motion to Dismiss and to Supplement the Motion to Remand. (DSOF ¶ 87.) Plaintiff again argued for remand using evidence obtained from the police report, which was disclosed to them in the criminal case. (*Id.* ¶ 88.) Plaintiff's motion addressed "two separate, but related, time periods of misconduct:" (1) "The misconduct during the grand jury presentation;" and (2) "The failure of prosecutors within MCAO post-indictment to remedy the misconduct once put on notice of it by the defense." (*Id.* ¶ 90.) Plaintiff did not allege any suppression or concealment unrelated to the grand jury testimony and, again, relied on information from the police report. (*Id.* ¶ 91.)

Plaintiff specifically argued that both Defendant Davidson and Prosecutor Brady allegedly knew about all the exculpatory evidence and were not unaware because:

> Under what circumstances, would either of them be unaware, of these facts? It would mean both of them had not reviewed the relevant police reports nor read the crash analysis of their own expert which this prosecution was based. Davidson and Brady had police reports and body camera video contradicting his claim to the grand jury about the witnesses. Similarly, regarding the Berla data, they both had a police report documenting a warning from the manufacture(sic) that speed determinations from Berla data could not be relied on for accuracy. Their own expert also identified a material error in the data that he could not reconcile. And Gibbs' mandate, about the officer's failure to exercise due care, was in the same crash analysis as his Berla findings. Are we to believe that Davidson and Brady never reviewed these essential pieces of

> evidence, prior to the grand jury presentation? Is that plausible?

(DSOF ¶ 92.)

Superior Court Judge Ryan-Touhill denied the Motion to Dismiss but granted the Motion to Remand. (DSOF ¶ 93.) The court's August 10, 2022 ruling on Plaintiff's challenge to the indictment expressed "very serious concerns" about the testimony presented to the grand jury and found Defendant Davidson's omissions and misrepresentations to be troubling and preclusive of a fair presentation. (PSOF ¶ 63; Doc. 121-3 at 176-184.) The court examined Defendant Davidson's grand jury testimony and found

> While Officer Rutherford held up his hand to stop a Toyota Tundra from passing—thus allowing the officer to walk into that lane of traffic—the evidence presented to the Grand Jury does not include information that Officer Rutherford *then* stepped into the next lane of traffic without first blocking the traffic or again looked westbound to ensure his own safety. . . . [N]owhere in his testimony does Det. Davidson acknowledge that Officer Rutherford failed to again to look west into traffic before stepping into the two-way left turn lane. This is critical. Det. Gibbs' statement regarding Officer Rutherford's contribution to the incident is clearly exculpatory and the State should have presented it to the Grand Jury. . . . If the Grand Jury was told that Officer Rutherford "could have also avoided the collision," the jurors may not have found probable cause that a crime was committed and Defendant committed that crime.

(Doc. 121-3 at 181 (emphasis in original).)

The court determined that Defendant Davidson gave the impression that Officer Rutherford responded to a police emergency when he crossed the street, which the court found was not supported by the evidence, as the grand jury was not given evidence of the total amount of time between when Officer Miller left the scene to cross Indian School Road to when Officer Rutherford decided to join Miller other than the witness saying, "a few seconds." (DSOF ¶ 94.) The judge also determined that Defendant Davidson lacked

knowledge of Officer Rutherford's state of mind. (*Id.* ¶ 95.) The court found that Defendant Davidson created an impression with the jurors that Officer Rutherford acted quickly to assist a fellow officer in an urgent or dangerous matter, unrelated to the car accident. (*Id.* ¶ 96.) The court determined that attributing Officer Rutherford's actions to the report of a "subject with a gun" was improper speculation as the evidence indicates only that Officer Rutherford either completed his accident investigation or chose to pause it to address an unrelated matter across the street. (*Id.* ¶ 97.) The court concluded that "Officer Rutherford made this choice [to attend to an unrelated matter across the street] for reasons unknown" as there was no request for additional assistance, no witness observed Officer Miller signaling to Rutherford, and Rutherford "only provided a cursory explanation to witnesses regarding wishing to check on his partner." (*Id.* ¶ 98.)

The court also found that Defendant Davidson gave legal conclusions about the right-of-way that the State should have corrected but instead the State failed to present any evidence to the grand jury that an officer "acting under the color of his authority" automatically has the right-of-way in crossing traffic. (DSOF ¶ 102.) the court determined that Defendant Davidson also told the grand jury that Plaintiff breached her duty to drive in a reasonable manner, which was a factual determination. (*Id.* ¶ 103.) The court concluded that the State allowed their witness to present evidence designed to evoke sympathy from the jurors to distract the grand jury on whether probable cause exists. (*Id.* ¶ 104.) The court found other arguments by Plaintiff to be unpersuasive:

> For example, although both parties spent time discussing the Berla data and whether investigators knew or should have known that they could or could not rely upon the data is a dispute the jury should resolve after trial. Additionally, even though Det. Davidson said 'all' witnesses claimed [Plaintiff] was driving too fast and this is incorrect, the existence of one witness who provided a contrary claim is not clearly exculpatory.

(DSOF ¶ 105.)

The court found that "due process compels a prosecutor to make a fair and impartial presentation to the grand jury," and for the reasons stated, "the State failed to present evidence to the Grand Jury in a fair and impartial manner, including exculpatory evidence." (Doc. 121-3 at 184, citing *Trebus v. Davis*, 189 Ariz. 621, 944 P.2d 1235 (1997).) The court determined that while Plaintiff "raise[d] very serious concerns regarding the grand jury presentation, the appropriate remedy is remand, not dismissal." (Doc. 121-3 at 177.) The court granted Plaintiff's Motion for Remand to Grand Jury for a New Determination of Probable Cause and gave the State 15 days to re-present the matter to the Grand Jury. (*Id*. at 184.)

**2. The Preliminary Hearing**

Following the remand ruling, Defendant Davidson discussed the ruling with prosecutor Brady, and MCAO made the determination that they would proceed with a preliminary hearing as it presented a better environment to produce evidence. (DSOF ¶ 106.) Before the preliminary hearing, Defendant Davidson met with the prosecutors to go over the points made by Judge Ryan-Touhill so that he was prepared to address them in his testimony. (*Id*. ¶ 107.)

In September 2022, Superior Court Judge Joseph Kreamer held a three-day preliminary hearing for probable cause, during which Defendants Davidson and Gibbs testified. (PSOF ¶ 64.) At the close of the preliminary hearing on September 22, 2022—three and a half years after the underlying events—Judge Kreamer concluded that the prosecution had not shown probable cause for the negligent homicide charge against Plaintiff and dismissed the case.[6] (*Id*. ¶ 65; Doc. 121-3 at 38 (Prelim. Hr'g Tr., Sept. 22,

---

[6] Judge Kreamer stated that "a person commits negligent homicide, if with criminal negligence, the person causes the death of another." (Doc. 121-3 at 224 (Prelim. Hr'g Tr. 39:2-5.) Criminal negligence occurs when "a person fails to perceive a substantial and unjustifiable risk, that the result will occur, or that the circumstance exists. The risk must be of such nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation." (*Id*. (Prelim. Hr'g Tr. 39:13-22).) The court noted that criminal negligence requires a higher standard of care than ordinary negligence. (*Id*. at 226-27 (Prelim. Hr'g Tr. 41:23-42:3).)

2022.) The court gave no weight to the Berla data based on "the lack of expertise of the officers with the Berla data;" an insufficiency of data points; and "the clear uncertainty of GPS as evidence[d] by different GPS readings" in Plaintiff's vehicle. (*Id.* ¶ 66.) The court found that the prosecutor had not supported a speed of 50 mph, but even that speed would not satisfy gross negligence. (*Id.* ¶ 67.) The court accepted the state's position that Plaintiff's speed at the time of braking was 37 mph. (Doc. 121-3 at 227 (Hearing Tr. at 42:15-17).) As for the alleged failure to perceive a risk, the court concluded that "[e]ach situation, whether it's a car accident or not, presents a different circumstance and a different set of risks"; the potential risk for a driver in the turn lane was "Officer Rutherford, unfortunately, crossing traffic, running across traffic, stopping the vehicle in the through lane, but not looking or waiting for the middle lane." (PSOF ¶ 68.) The court found that it was "not reasonable" for Plaintiff to anticipate any risk of Officer Rutherford running across traffic in front of her, because "he appeared from a place that he shouldn't have been to a regular driver" and there was "no evidence that she had time to perceive" a risk and could have stopped. (*Id.* ¶ 69.) Accordingly, the court found that "identifying the risk and whether there is a gross deviation, it is not a risk that she could have reasonably suspected and the failure to perceive it does not constitute a gross deviation from the standard of care that a reasonable person would observe in this situation." (*Id.* ¶ 70.) Instead, Plaintiff had "a right to assume, when operating her vehicle, that others will follow the rules of the road, whether that's a pedestrian or another vehicle. And, unfortunately, Officer Rutherford did not." (*Id.* ¶ 71.)

The court stated that the events before the grand jury were not relevant, nor were any thoughts, perceptions, or determinations regarding the motivations of the PPD, the County Attorney's Office, or the grand jury. (DSOF ¶ 110.) Instead, Judge Kraemer made clear that the only relevant issue was the evidence presented by the State in the preliminary hearing. (*Id.* ¶ 111.) The court determined the State had not established probable cause. (*Id.* ¶ 112.)

The court focused on the meaning of criminal negligence, on what was a "substantial and unjustifiable risk," and whether "the failure to perceive it [was] a gross deviation of the standard of care." (DSOF ¶ 113.) The court determined that the evidence demonstrated that Plaintiff's speed at the time of impact or immediately before was 35 to 40 mph. (*Id.* ¶ 114.) It did not give any weight to the Berla data and was unsure if it would ever get to a jury. (*Id.* ¶ 115.) The court did not think the fact that Officer Rutherford was not wearing a vest to be relevant. (*Id.* ¶ 116.) The court did not think it mattered why Officer Rutherford was going across the street. (*Id.* ¶ 117.) Instead, what was relevant was that Officer Rutherford appeared from a place that he should not have been to a regular driver. (*Id.* ¶ 118.) The court explained that because Officer Rutherford ran out in front of her, Plaintiff did not have time to perceive a risk. (*Id.* ¶ 119.) It reasoned that while Plaintiff going the speed she was going could be negligence, it was not gross negligence. (*Id.* ¶ 120.) The court determined that Plaintiff had a right to assume, when operating her vehicle, that others will follow the rules of the road, whether that's a pedestrian or another vehicle and, unfortunately, Officer Rutherford did not. (*Id.* ¶ 121.) The court determined that this is a very difficult decision and was sorry that it had to be made by the court. (*Id.* ¶ 122.) The case was dismissed without prejudice. (*Id.* ¶ 123.)

**D. Impact of the Accident on Plaintiff**

On the day of the accident, Plaintiff was placed on paid leave from her job because Defendant Davidson met with her employer. (PSOF ¶ 72.) Weeks later, she met with her supervisor and human resources, who informed her that she could return to work, but if she was ticketed or charged, she would be terminated. (*Id.* ¶ 73.) Plaintiff returned to work, and human resources met with her regularly to ask if she had any new information on the investigation, but she eventually resigned because of the stress of commuting to and from work and because she did not feel comfortable under such a microscope, and she sought employment closer to her home. (*Id.* ¶ 74.) Eventually, Plaintiff had to take extra jobs to pay for the enormous financial burden of her legal defense. (*Id.* ¶ 75.) Due to the indictment, Plaintiff's fingerprint clearance card was suspended, and she was forced to seek

employment outside her professional scope and expertise to supplement her income, such as cleaning and warehouse jobs that did not require background checks. (*Id.* ¶ 76.) Because of the criminal prosecution, Plaintiff was even denied employment opportunities after her case was dismissed and her fingerprint clearance card was reinstated. (*Id.* ¶ 77.) Although she has a bachelor's degree in public administration and intended to remain in public service until retirement, she has had difficulty finding new government employment. (*Id.* ¶ 78.)

Plaintiff's foster child whom she loved and intended to adopt—was removed from her home, and Plaintiff never saw her again. (*Id.* ¶ 79.) The trauma of the child's removal forced Plaintiff to surrender her long standing foster license. (*Id.* ¶ 80.) She also lost her vehicle to impoundment and declared bankruptcy due to debt. (*Id.* ¶ 81.) Over the course of the drawn-out proceedings, Plaintiff worried that she would go to prison, and in addition to severe panic attacks that sent her to the emergency room, she suffered anxiety, depression, stomach pains, headaches, and difficulty sleeping. (*Id.* ¶ 82.) Eventually, Plaintiff's mental health deteriorated to the extent that she sought continuing professional mental healthcare. (*Id.* ¶ 83.)

## V. Discussion

### A. Federal Claims

#### 1. Malicious Prosecution (Count Two)

Plaintiff asserts Count Two against Defendants Davidson and Gibbs.

To prevail on a federal malicious prosecution claim, a plaintiff must show "that the defendants prosecuted [her] with malice and without probable cause, and that they did so for the purpose of denying [her] equal protection or another specific constitutional right." *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1189 (9th Cir. 1995), *as amended on denial of reh'g and reh'g en banc* (Dec. 29, 1995).

Under some circumstances, a plaintiff may bring a malicious prosecution claim against a police officer based on the officer's actions during an investigation that led to a false prosecution. *See, e.g.*, *Tennison v. City & Cnty. of San Francisco*, 570 F.3d 1078,

1089 (9th Cir. 2009) ("a § 1983 plaintiff must show that police officers acted with deliberate indifference to or reckless disregard for an accused's rights or for the truth in withholding evidence from prosecutors); *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1067 (9th Cir. 2004) (a plaintiff may state a § 1983 claim against officers who "improperly exerted pressure on the prosecutor, knowingly provided misinformation to him, concealed exculpatory evidence, or otherwise engaged in wrongful or bad faith conduct . . . causing the initiation of legal proceedings"); *Tatum v. Moody*, 768 F.3d 806, 820 (9th Cir. 2014) (a plaintiff can state a due process claim against an officer where a detention is "of (1) unusual length, (2) caused by the investigating officers' failure to disclose highly significant exculpatory evidence to prosecutors, and (3) due to conduct that is culpable in that the officers understood the risks to the plaintiff's rights from withholding the information or were completely indifferent to those risks").

Where a prosecutor files criminal charges against the accused, police officers are generally immune to suits for damages resulting from a subsequent prosecution because "it is presumed that the prosecutor filing the complaint exercised independent judgment" in finding that the charges are supported by probable cause; therefore, "[t]he plaintiff bears the burden of producing evidence to rebut such presumption." *Newman v. Cnty. of Orange*, 457 F.3d 991, 993 (9th Cir. 2006).

Plaintiff argues in her Motion that Defendants provided misinformation to the prosecutor and concealed exculpatory evidence, omitted, exaggerated, and mischaracterized material evidence to both the prosecutor and grand jury, intent on obtaining an indictment. (Doc. 120 at 13.) She argues that in doing so, "Defendants had the goal—and outcome—of denying Plaintiff her Fourth Amendment constitutional right to be free from unreasonable seizure, as further discussed infra." (*Id*. at 14, citing *Thompson v. Clark*, 596 U.S. 36, 42 (2022) (Fourth Amendment claim under § 1983 for malicious prosecution).) Plaintiff contends that the superior court's dismissal of charges for lack of probable cause shows that the prosecution against her "terminated in such a manner as to indicate [her] innocence." (*Id*. at 14, quoting *Awabdy*, 368 F.3d at 1066.)

Defendants argue that Plaintiff's federal malicious prosecution claim fails because Arizona provides an adequate remedy for malicious prosecution, which forecloses a parallel § 1983 claim. (Doc. 134 at 34, citing *Bretz v. Kelman*, 773 F.2d 1026, 1031 (9th Cir. 1985) ("We have held that malicious prosecution generally does not constitute a deprivation of liberty without due process of law and is not a federal constitutional tort if process is available within the state judicial systems to remedy such wrongs. . . . But, we have also held that an exception exists to the general rule when a malicious prosecution is conducted with the intent to deprive a person of equal protection of the laws or is otherwise intended to subject a person to a denial of constitutional rights.") In addition, Defendants argue that Plaintiff has failed to identify a violation of a specific constitutional right as required to state a federal malicious prosecution claim, and to the extent she is relying on her allegation that Defendants had the goal and outcome of denying Plaintiff her Fourth Amendment right to be free from unreasonable seizure, Plaintiff's Fourth Amendment claim has been dismissed and she was never arrested or seized, so she cannot rely on the Fourth Amendment as the source either. (*Id.*)

Plaintiff does not address her federal malicious prosecution claim or Defendants' arguments at all in her Reply/Response to Defendants' Motion. (*See* Doc. 140.) Defendants argue in their Reply that by not addressing their arguments, Plaintiff has abandoned this claim. (Doc. 147 at 9.)

The Court agrees that Plaintiff appears to have abandoned her federal malicious prosecution claim. Plaintiff does not address her federal malicious prosecution claim at all in her Response/Reply. And in her own Motion for Summary Judgment, Plaintiff only argued that Defendants prosecuted her for the purpose of depriving her of her Fourth Amendment constitutional right to be free from unreasonable seizure. But Plaintiff had already stipulated to dismissal of her Fourth Amendment claim at the time she filed her Motion for Summary Judgment, and she does not make any further argument in her Motion about her right to be free from unreasonable seizure. Nor does the evidence reflect that Plaintiff was ever arrested or seized in order to support a Fourth Amendment unlawful

seizure. Accordingly, Plaintiff has not met her initial burden at summary judgment, and the Court will deny her Motion and will grant summary judgment to Defendants on Count Two. *See, e.g.*, *Jenkins v. Cnty. of Riverside*, 398 F.3d 1093, 1095 n.4 (9th Cir. 2005) ("Jenkins abandoned her other two claims by not raising them in opposition to the County's motion for summary judgment.").

**2. Fourteenth Amendment Due Process (Count Six)**

Plaintiff asserts Count Six against Defendants Davidson and Gibbs. Plaintiff does not specify if she is making a substantive or procedural due process claim where she alleges that Defendants failed to produce exculpatory and impeachment material to Plaintiff, including the Berla data and their own lack of expertise regarding Berla data, and suppressed favorable information by failing to provide the prosecution information about the unreliability of Berla data "and other pertinent information about the case," thus depriving Plaintiff "of her constitutional right to a fair proceeding and due process of law." (Doc. 29 ¶¶ 131-136.)

The Due Process Clause of the Fourteenth Amendment embodies a substantive component that protects against 'certain government actions regardless of the fairness of the procedures used to implement them.'" *Immediato v. Rye Neck Sch. Dist.*, 73 F.3d 454, 460-61 (2d Cir. 1996) (quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986)). "The concept of 'substantive due process' . . . forbids the government from depriving a person of life, liberty, or property in such a way that 'shocks the conscience' or 'interferes with rights implicit in the concept of ordered liberty.'" *Nunez v. City of Los Angeles*, 147 F.3d 867, 871 (9th Cir. 1998) (internal citations omitted). Thus, "substantive due process secures individuals from "arbitrary" government action that rises to the level of "egregious conduct," not from reasonable, though possibly erroneous, legal interpretation." *Brittain v. Hansen*, 451 F.3d 982, 996 (9th Cir. 2006).

Plaintiff argues that she "has a due process right to the disclosure of material and exculpatory evidence." (Doc. 120 at 15, citing *Youngblood v. W. Va.*, 547 U.S. 867, 869 (2006) (holding that "a *Brady* [*v. Maryland*, 373 U.S. 83, 87 (1963)] violation occurs when

the government fails to disclose evidence materially favorable to the accused," including impeachment and exculpatory evidence).) Plaintiff argues that Defendants' withholding of material and exculpatory material from herself and the prosecutor displayed deliberate indifference to Plaintiff's rights, "as Defendants consciously and/or recklessly disregarded the strong possibility that their actions would deprive [Plaintiff] of her liberty." (*Id*. at 16.). Plaintiff argues that as a result of Defendants' actions, she was deprived of her constitutional rights to liberty and a fair criminal proceeding, and if they had disclosed the evidence withheld from the prosecutor and grand jury, there is a "reasonable probability" that the results would have been different. (*Id*. at 17.)

Defendants argue that the legal contours of this claim are unclear because in Plaintiff's FAC she alleged that Defendants deliberately failed to "produce exculpatory and impeachment material" but only identified the unreliability of the Berla data as the factual predicate for this claim and Plaintiff alleged that Defendant Davidson "suppressed favorable information to [Plaintiff]." (Doc. 134 at 39.) Defendants argue these "buzz words" mirror some of the legal elements of a *Brady* claim, but Plaintiff does not have a cognizable *Brady* claim because there was never a criminal trial, and *Brady* only relates to obligations to produce exculpatory evidence before a criminal trial. (*Id*., citing Ninth Cir. Model Jury Instruction 9.33A; *United States v. Aichele*, 941 F.2d 761, 764 (9th Cir. 1991) ("*Brady* does not necessarily require that the prosecution turn over exculpatory material before trial); *United States v. Mitchell*, 777 F.2d 248, 255 (5th Cir. 1985) ("Although the government provided a large amount of Jencks Act and *Brady* materials the day before trial, and other such materials during trial, there has been no showing that the defendants failed to receive the materials in time to effectively cross-examine witnesses.") In addition to the fact that there was no criminal trial, Defendants argue that all evidence was disclosed to Plaintiff via the police reports and the hard drive that Defendant Davidson hand delivered to the prosecutor, as Plaintiff's criminal lawyer admitted in his filings. (*Id*. at 40.) Defendants argue that *Brady* is not violated where the criminal defendant is aware of

the exculpatory evidence. (*Id*., citing *Raley v. Ylst*, 444 F.3d 1085 (9th Cir.), *amended by* 470 F.3d 792 (9th Cir. 2006).)

Defendants argue that because Plaintiff cannot bring a *Brady* claim, she must establish some other legal basis for her Fourteenth Amendment claim, which she does not do in her Motion for Summary Judgment. (*Id*. at 41.) Defendants argue, to the extent she is bringing a Fourteenth Amendment claim based on suppression of evidence, such a claim fails because Plaintiff was not arrested or detained pending a criminal trial. (*Id*. at 41, citing *Tatum v. Moody*, 768 F.3d 806, 816 (9th Cir. 2015) (holding that "[w]here, as here, investigating officers, acting with deliberate indifference or reckless disregard for a suspect's right to freedom from unjustified loss of liberty, fail to disclose potentially dispositive exculpatory evidence to the prosecutors, leading to the lengthy detention [over 2 years] of an innocent man, they violate the due process guarantees of the Fourteenth Amendment").)

Plaintiff responds that disclosure of exculpatory evidence "to escape the *Brady* sanction, must be made at a time when the disclosure would be of value to the accused" and that police officers can violate due process rights "when they act with deliberate indifference to or reckless disregard for an accused's rights or for the truth in withholding evidence from prosecutors." (Doc. 140 at 15, quoting *United States v. Davenport*, 753 F.2d 1460, 1462 (9th Cir. 1985) (holding that because the defendant had access to the exculpatory information from the beginning of the trial and defendant made use of it in cross-examining a witness, the prosecution's delay in disclosing that information until after the identification lineup had been held did not amount to a due process violation or suppression of exculpatory evidence under *Brady*) and citing *Tennison*, 570 F.3d at 1088 (evidence was sufficient to establish that homicide investigators acted with reckless indifference to former prisoners' rights when investigators withheld third party's confession from prosecutors shortly after guilty verdict was returned in prisoners' murder prosecution.) Plaintiff argues that courts in the Ninth Circuit have recognized due process claims where law enforcement used false and distorted evidence. (Doc. 140 at 16, citing

*Samuelson v. Jewell Sch. Dist. 8*, 725 F.Supp.3d 1195, 1215 (D. Or. 2025) (finding that "a reckless investigation claim is cognizable as a substantive due process claim in the Ninth Circuit and rests on the liberty interest of a fair criminal proceeding"). Plaintiff argues that Defendants presented a "skewed version of the facts," repeatedly relied on inaccurate and omitted evidence and knew that the charge against Plaintiff lacked merit. (*Id.*)

Plaintiff's citation to *Davenport* and *Tennison* appear to show Plaintiff is trying to make a *Brady* claim, but she was never subject to a criminal trial, so those citations are unhelpful. Plaintiff's citations to *Samuelson* is also unhelpful because she did not plead a reckless investigation claim and she raises this argument for the first time in her Reply/Response. *See Padgett v. Wright,* 587 F.3d 983, 985 n.2 (9th Cir. 2009) (per curiam) (the court will not consider arguments raised for the first time in a reply brief); *Cedano-Viera v. Ashcroft*, 324 F.3d 1062, 1066 n.5 (9th Cir. 2003) (the Ninth Circuit Court of Appeals "declines to consider new issues raised for the first time in a reply brief."); *United States v. Wright*, 215 F.3d 1020, 1030 n.3 (9th Cir. 2000) (declining to consider an argument raised for the first time in reply brief).

In addition, Plaintiff has failed to present evidence that Defendants Davidson and Gibbs failed to produce exculpatory and impeachment material to Plaintiff or the prosecutor, as she alleged. In fact, Plaintiff specifically asserted in her state court Motion to Dismiss filed on April 27, 2022, that Defendant Davidson and Prosecutor Brady allegedly knew about the exculpatory evidence. In her Motion to Dismiss, Plaintiff asserted:

> Under what circumstances, would either of them [Davidson or Brady] be unaware, of these facts? It would mean both of them had not reviewed the relevant police reports nor read the crash analysis of their own expert which this prosecution was based. Davidson and Brady had police reports and body camera video contradicting his claim to the grand jury about the witnesses. Similarly, regarding the Berla data, they both had a police report documenting a warning from the manufacture(sic) that speed determinations from Berla data could not be relied on for accuracy. Their own expert also identified a material error in the data that he could not reconcile. And Gibbs' mandate,

> about the officer's failure to exercise due care, was in the same crash analysis as his Berla data findings. Are we to believe that Davidson and Brady never reviewed these essential pieces of evidence, prior to the grand jury presentation? Is that plausible?

(Doc. 129-2 at 161-162). This evidence contradicts Plaintiff's claim that Defendants withheld evidence from the prosecutor. And this evidence shows that at some point in the proceedings—long before the preliminary hearing—that Plaintiff, too, had this evidence. The gravamen of Plaintiff's complaint is that Defendant Gibbs did not present the exculpatory evidence to the grand jury or misled the grand jury on the law. Yet, that fails to show that Defendants did not produce exculpatory and impeachment material to Plaintiff or the prosecutor.

Based on this record, there is no genuine issue of material fact that Defendants Gibbs and Davidson failed to produce exculpatory and impeachment material to Plaintiff or the prosecutor, and the Court will deny summary judgment to Plaintiff and will grant summary judgment to Defendants on Count Six.

### B. State Law Claims

#### 1. Malicious Prosecution (Count One)

Plaintiff asserts Count One against Defendants Davidson, Gibbs, and City of Phoenix.

In Arizona, the essential elements of an action for malicious prosecution are: "(1) a criminal prosecution, (2) that terminates in favor of plaintiff, (3) with defendants as prosecutors, (4) actuated by malice, (5) without probable cause and (6) causing damages." *Cullison v. City of Peoria*, 584 P.2d 1156, 1160 (Ariz. 1978) (citations omitted). "A criminal defendant may maintain a malicious prosecution claim not only against prosecutors but also against others—including police officers and investigators—who wrongfully caused his prosecution." *Donahoe v. Arpaio*, 986 F. Supp. 2d 1091, 1103–04 (D. Ariz. 2013. (quoting *Smith v. Almada,* 640 F.3d 931, 938 (9th Cir.2011). Probable cause "constitutes a complete and absolute defense to an action for malicious prosecution." *Slade v. City of Phoenix*, 301, 541 P.2d 550, 553 (Ariz. 1975).

**a. Initiation of Criminal Proceedings**

Plaintiff argues there is no dispute that Defendants initiated a criminal proceeding by submitting a Form IV and arguing for the Maricopa County Attorney to charge Plaintiff with a felony. (Doc. 120 at 10.)

Defendants argue there is no support for Plaintiff's contention that Defendants initiated the criminal proceeding when Plaintiff was not arrested, the Form IV was delivered to the prosecution solely for purposes of submitting the case for review, and the criminal case was not actually initiated until the MCAO presented the case to the grand jury, seeking a charge of negligent homicide, not manslaughter. (Doc. 134 at 25.) Defendants argue that because the MCAO chose a different criminal charge than what was in the Form IV establishes prosecutorial independence, as does the fact that nothing happened for nearly a year until MCAO independently reviewed the case and then proceeded with their charge of negligent homicide. (*Id.*)

The Arizona Supreme Court has held that "a malicious prosecution action will not lie where a prosecuting attorney is left to judge the propriety of proceeding with the charge and acts on his own initiative in doing so." *Walsh v. Eberlein*, 560 P.2d 1249, 1252 (Ariz. 1976) ("Where the instigator of a proceeding loses control over the case once the prosecution has been initiated, his participation in the prosecution thereafter is not such as will subject him to liability.") This is a rebuttable presumption, however, and "an officer who 'maliciously or recklessly makes false reports to the prosecutor may be held liable for damages incurred as a proximate result of those reports,' or where the prosecutor was 'pressured or caused by the investigating officers to act contrary to his independent judgment.'" *Fields v. McQueen*, No. CV16-02863-PHX-GMS (MHB), 2019 WL 9463814, at *4 (D. Ariz. Dec. 3, 2019), *aff'd,* 828 F. App'x 433 (9th Cir. 2020) (quoting *Blankenhorn v. City of Orange*, 485 F.3d 463, 482 (9th Cir. 2007)).

Here, Defendant Gibbs' crash analysis, Defendant Davidson's Form IV, his PowerPoint presentation to the prosecutor, and his argument with the prosecutor about the charge and who should prosecute raise questions of fact whether the disputed

misrepresentations or omissions pressured or caused the prosecutor to act contrary to her independent judgment.

**b. Probable Cause**

Plaintiff argues that Defendants are estopped from relitigating the issue of whether the prosecution had probable cause to prosecute her for negligent homicide because the Arizona superior court determined after a three-day preliminary hearing that the prosecution had not shown there was probable cause. (Doc. 120 at 10.) Plaintiff contends that because Arizona courts would preclude Defendants from relitigating the issue of probable cause, Defendants are precluded from relitigating the issue in this Court. (*Id.*)

Defendants argue that they are not estopped from arguing the issue of probable cause because the PPD Defendants were not in privity with the prosecution, they had no legal right to control the prosecution or determine what evidence to present at any hearing, and the rights at issue were fundamentally different. (Doc. 134 at 29-30.) Defendants also argue that Plaintiff was not arrested before the grand jury presentation and there was no warrant sought by officers; rather, Defendants submitted the case to MCAO for review and recommended charges, but no charges were issued until after the grand jury indictment. (*Id.* at 31.) Defendants argue that detectives were justified in concluding that a fair probability existed that Plaintiff's conduct constituted a crime and submitted the case to MCAO for further review, and MCAO independently evaluated the case and decided to proceed directly to grand jury. (*Id.*) They contend that the fact that the state later failed to meet the heightened standard of criminal negligence at the preliminary hearing does not retroactively erase the probable cause that existed during the investigation. (*Id.*, citing *Freeman v. City of Santa Ana*, 68 F.3d 1180 (9th Cir. 1995) ("The mere fact a prosecution was unsuccessful does not mean it was not supported by probable cause.")

The evidence reflects that Judge Kreamer determined that MCAO did not have probable cause to charge Plaintiff with negligent homicide. Defendants' disagreement with that determination merely supports that there is, at minimum, a question of fact whether there was probable cause to charge Plaintiff with criminal negligence.

**c. Whether Proceedings Terminated in Plaintiff's Favor**

"An individual seeking to bring a malicious prosecution claim must generally establish that the prior proceedings terminated in such a manner as to his innocence." *Awabdy*, 368 F.3d at 1068; *Frey v. Stoneman*, 722 P.2d 274, 278 (Ariz. 1986) ("When a termination or dismissal indicates in some fashion that the accused is innocent of wrongdoing it is a favorable termination."). If the termination is "merely a procedural or technical dismissal it is not favorable." *Frey*, 722 P.2d at 278; *see also Mills*, 921 F.3d at 1171.

Plaintiff argues that the criminal proceedings clearly terminated in her favor given the superior court's dismissal of the charges. (Doc. 120 at 10.) Defendants respond that Plaintiff does not address that the dismissal was without prejudice and without any indication or finding of innocence. (Doc. 134 at 27.)

The evidence here reflects that the state court held a three-day preliminary hearing and examined the evidence presented by Plaintiff and the prosecution to determine that probable cause to charge her with criminal negligence was lacking. The superior court dismissed the criminal case against Plaintiff without prejudice. There is no evidence that the prosecution has charged Plaintiff since the superior court's dismissal. This evidence indicates that Plaintiff is innocent of the wrongdoing as charged by the prosecution. *Frey*, 722 P.2d at 278.

Based on this record, there is, at minimum, a question of fact whether the state court criminal proceedings terminated in Plaintiff's favor.

**d. Malice**

Plaintiff must show that "'the criminal proceedings were initiated on the basis of the Defendants' intentional and knowingly false accusations and other malicious conduct.'" *McSherry v. City of Long Beach*, 584 F.3d 1129, 1135 (9th Cir. 2009) (quoting *Awabdy*, 368 F.3d at 1067).

Plaintiff argues that by initiating and continuing with the criminal proceedings despite knowing they lacked probable cause for negligent homicide, Defendants acted with

malice and not with any intent to bring an offender to justice. (Doc. 120 at 10.) Plaintiff argues that Defendants knew they lacked probable cause for negligent homicide, yet continued their flawed investigation and omitted, misrepresented, or exaggerated facts unfavorable to the prosecution. (*Id*. at 10-11.) Plaintiff contends the second crash analysis that Gibbs performed at Davidson's request was highly unusual, that Gibbs was untrained in Berla data analysis and knew the Berla data was neither accurate nor widely accepted in the accident reconstruction community, that Gibbs did not attempt to resolve the inconsistencies in the Berla data and disregarded that Plaintiff could have been driving more slowly than the Berla data indicated, that a Berla representative warned Gibbs' coworker they were unable to quantify the accuracy of the extracted GPS positions, and Gibs failed to disclose any of these deficiencies in his report. (*Id*. at 11.) Plaintiff argues that Davidson not only failed to seek independent review of the Berla data, but he relied solely on Gibbs' report and concealed issues with the Berla data and Gibbs' report from the prosecutors.[7] (*Id*.)

Plaintiff argues that Davidson's insistence on prosecuting her for negligent homicide and his atypical employment of investigative and persuasive tactics cements his malicious intent. (*Id*. at 12.) Plaintiff asserts that Davidson argued with the prosecutor's office when he learned that the county attorney was reassigning this case to a prosecutor who would bring only a misdemeanor charge, and Davidson argued for a more serious charge and to return the case to the original prosecutor. (*Id*.) Plaintiff points to Davidson's admission that he had never before personally delivered a case file to the prosecutor's office and his request that Gibbs perform a second crash analysis as reflecting "Defendants' zealous mission to bring felony charges against [Plaintiff] by any means, when all the facts pointed against probable cause." (*Id*.)

Defendants argue there was no showing of malice, which requires a showing that

---

[7] Plaintiff also takes issue with Davidson's grand jury testimony, but a police officer, like any other grand jury witness, "has absolute immunity from any § 1983 claim based on the [officer's] testimony." *Rehberg v. Paulk*, 566 U.S. 356, 369 (2012).

Defendants used the prosecution for a primary purpose other than bringing an offender to justice. (Doc. 134 at 33, citing *Lantay v. McLean*, 406 P.2d 224, 225 (Ariz. Ct. App. 1965).) Defendants argue the undisputed record shows they disclosed conflicting evidence, prepared a comprehensive case presentation that highlighted case issues, and answered the prosecutor's and grand juror's questions, which is the opposite of animus or ulterior motive. (*Id.*) They contend that the court's ruling that the evidence did not meet the criminal negligence standard is a legal sufficiency determination, not a finding of misconduct or malice. (*Id.*)

The unusual steps Defendants took by conducting two crash analyses, the questionable use of Berla data, the failure to address the potential unreliability of the Berla data, the Berla representative's warning and the possible wide range of speeds in the accident report, omitting details from the Form IV, meeting with the prosecutor and arguing with the prosecutor about what charge to bring and who to assign to the case, and preparing a PowerPoint presentation that omitted certain exculpatory facts, creates a question of fact about whether Defendants acted with malice.

**e. Damages**

The parties do not address damages in their Motions. (*See* Docs. 120, 134.) Plaintiff presents evidence that as a result of Defendants' actions, she was put on paid leave from her job after Davidson met with her employer, that she did not feel comfortable on the job when she later returned and so resigned due to the stress, that she could no longer work in her field because her fingerprint clearance was suspended, that she had to take extra jobs to pay for legal services, that her foster child was removed from her home, she lost her vehicle to impoundment, declared bankruptcy, and sought medical care for panic attacks, anxiety, depression and other issues. Thus, there is a question of fact whether Plaintiff suffered damages due to Defendants' actions.

Based on this record, there is a question of fact whether Defendants subjected Plaintiff to malicious prosecution under Arizona state law, and the Court will deny summary judgment as to Count One.

**2. IIED (Count Four)**

Plaintiff asserts Count Four against Defendants Davidson, Gibbs, and City of Phoenix

IIED requires proof of three elements: (1) the conduct must be "extreme and outrageous"; (2) the defendant must intend to cause emotional distress or recklessly disregard that such distress will, with a near certainty, occur from his conduct; and (3) severe emotional distress must occur as a result of the defendant's conduct. *Citizen Publ'g Co. v. Miller*, 115 P.3d 107, 110 (2005) (citing *Ford v. Revlon*, 734 P.2d 580, 585 (1987)). To satisfy the "extreme and outrageous" element, a defendant's conduct must be "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and be regarded as atrocious and utterly intolerable in a civilized community." *Mintz v. Bell Atl. Sys. Leasing Int'l, Inc.*, 905 P.2d 559, 563 (Ariz. Ct. App. 1995). Whether a defendant's acts are sufficiently extreme or outrageous is determined by the court. *Demetrulias v. Wal-Mart Stores Inc.*, 917 F. Supp. 2d 993, 1012 (D. Ariz. 2013) (citing *Patton v. First Fed. Sav. & Loan Ass'n of Phoenix*, 578 P.2d 152, 155 (1978)).

Plaintiff argues that Defendants recklessly disregarding the "near certainty" that their actions would cause her severe emotional distress, and in continuing to prosecute Plaintiff after recognizing the utter lack of probable cause, Defendants' conduct was extreme and outrageous. (Doc. 120 at 14.) Plaintiff contends that Defendants followed unusual procedure, argued with the county attorney to prosecute her for negligent homicide, and blatantly omitted, misrepresented, and exaggerated facts in an attempt to support their improper prosecution. (*Id.*) As a result, Plaintiff asserts she lost her employment and her vehicle and took extra jobs to pay for her legal defense and eventually declared bankruptcy. (*Id.*) In addition, because of the criminal proceedings, Plaintiff's foster child, whom she loved and intended to adopt, was removed from her home, and Plaintiff never saw her again. (*Id.*) And the trauma of the child's removal forced Plaintiff to surrender her long-standing foster license. (*Id.*) Plaintiff further asserts that she

continually worried she would go to prison as a result of the prosecution and her mental health severely deteriorated to the extent she sought professional mental health care. (*Id.*)

Defendants argue that Plaintiff's IIED claim fails because she fails to allege conduct—that is not subject to absolute immunity—that is extreme and outrageous and caused severe emotional distress. (Doc. 134 at 37.) Defendants argue that investigation of a crime does not constitute extreme and outrageous conduct. (*Id.*) Defendants contend that Plaintiff's IIED claim is a failed attempted end run around testimony immunity, as the claim is based on the presentation at the grand jury proceedings, and Plaintiff cannot overcome the fact that Defendant Davidson has immunity for his testimony as well as "preparatory activities 'inextricably tied' to testimony." (*Id.*, quoting *Lisker*, 780 F.3d at 1241.) And Defendants assert that the IIED claim is barred by the one-year statute of limitations to the extent it is based on initiation of the prosecution. (*Id.* at 38, citing Ariz. Rev. Stat. § 12-821 ("All actions against any public entity or public employee shall be brought within one year after the cause of action accrues and not afterward".) Defendants argue any burdens, stresses, or collateral consequences arising from a pending criminal case flow from the independent decisions of prosecutors and the judiciary—not from the officers who merely conducted and submitted an investigation for review and testified when summoned. (*Id.*) They contend that investigating officers and the City of Phoenix do not control charging decisions, do not determine how or whether a case proceeds, and cannot be held responsible for the inherent consequences of criminal proceedings initiated by the County Attorney's Office. (*Id.*)

Plaintiff disputes that Defendants' investigative acts were inextricably tied to Davidson's testimony at the grand jury proceedings. (Doc. 140 at 12-13.) Plaintiff argues that Defendants omitted crucial details from their reports and documents submitted to prosecutors, failed to mention issues with the Berla data or Gibbs' ability to interpret that data, failed to present issues regarding Officer Rutherford's own policy failures, and omitted contradictory evidence, including witness statements regarding Plaintiff's speed. (*Id.*) Plaintiff also cites to Davidson's presentation to the Maricopa County Attorney in

which he argued about the correct charge and that Davidson never had to clear his testimony with the prosecutor before testifying or answering questions. Plaintiff argues her IIED claim was timely because she could not have known that she had a cause of action and had suffered qualifying emotional distress until the dismissal due to the lack of probable cause. (Doc. 140 at 14-15.) And she argues that Defendants had more than typical involvement in the prosecution after its initiation, and they were unusually persistent in their desire for Plaintiff's prosecution. (*Id.*)

Based on this record, there are questions of fact when Plaintiff's cause of action accrued and whether Defendants' actions were extreme and outrageous and beyond all possible bounds of decency. The prosecution of Plaintiff lasted nearly three and a half years before the criminal case was dismissed for lack of probable cause. Plaintiff presents evidence that during that time, she lost her career, her foster child, declared bankruptcy, and suffered extreme emotional distress for which she sought medical care.

Accordingly, the Court will deny summary judgment as to Count Four.

## VI. Conclusion

In this case, the federal claims will be dismissed and only state law claims remain. Because this case was removed by Defendants on the basis of the federal claims, the Court is prepared to remand the case to state court. The Ninth Circuit has "often repeated that 'in the usual case in which all federal-law claims are eliminated before trial, the balance of the factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims.'" *Acri v. Varian Assocs., Inc.*, 114 F.3d 999, 1001 (9th Cir. 1997) (en banc) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)). The Court is thus not inclined to continue to exercise supplemental jurisdiction over Plaintiff's state-law claims.

Nonetheless, the Court will give the Parties an opportunity to be heard before declining to exercise supplemental jurisdiction. *See Ho v. Russi*, 45 F.4th 1083, 1085 (9th Cir. 2022) ("Generally, a district court must provide litigants with notice and an opportunity to respond before dismissing a claim for failure to state a claim."). Within 10

days of the date of this Order, if either Party seeks to have the Court continue to exercise supplemental jurisdiction, the Party must file a Motion explaining why such jurisdiction is warranted.

If neither Party files a Motion within 10 days of the date of this Order, the Court will remand this action to the Maricopa County Superior Court.

**IT IS ORDERED:**

(1) The reference to the Magistrate Judge is **withdrawn** as to the parties' Cross Motions for Summary Judgment (Doc. 120, 134) and Defendants' Rule 702 Motion to Exclude Plaintiff's Expert (Doc. 131).

(2) Defendants' Rule 702 Motion to Exclude Plaintiff's Expert (Doc. 131) is **denied**.

(3) Plaintiff's Motion for Summary Judgment (Doc. 120) is **denied**.

(4) Defendants' Motion for Summary Judgment (Doc. 134) is **granted in part and denied in part**. The Motion is **granted** as to Counts Two and Six and **denied** as to Counts One and Four.

(5) Counts Two and Six are **dismissed with prejudice**.

(6) The remaining claims are Plaintiff's state law malicious prosecution claim (Count One) and IIED claim (Count Four).

(7) If Plaintiff or Defendants seek to have the Court continue to exercise supplemental jurisdiction over the remaining state-law claims, Plaintiff or Defendants must file a Motion explaining why such jurisdiction is warranted within **10 days** of the date of this Order.

(8) If neither Party files such a Motion within **10 days** of the date of this Order, the Clerk of the Court must **remand** this action to Maricopa County Superior Court.

Dated this 17th day of September, 2026.

Honorable Diane J. Humetewa
United States District Judge